The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to give their attention to the court is now sitting. God save the United States and this Honorable Court of Appeals. Good morning. I'll ask those lawyers who are not in the first case to please mute your sound and video, please. Good morning, Your Honors. And may it please the court. Samantha Shea, CARA Coalition for Petitioner Maria Arita-Deras. The board's decision must be reversed because it ignores undisputed record evidence and misapplies key legal standards for past persecution, corroboration, and nexus between past persecution and a protected ground. I will be discussing the issues of past persecution and corroboration. My co-counsel, Ms. Berman, will then discuss nexus. Your Honors, the facts in this case are not contested. We know that because Ms. Arita-Deras testified as to each one of the key facts for her claim and the immigration judge found her testimony credible. Starting in 2008, Ms. Arita-Deras and her family were relentlessly threatened and attacked by a local gang leader, Ricardo, who was jealous of petitioner's husband. Ms. Arita-Deras and her family moved twice, but the threats continued. And in 2011, Ricardo killed three of petitioner's family members, her two brothers-in-law and her father-in-law. Counsel, whereas the immigration judge asked for corroboration of items, including the ones you just mentioned, which I did not find in the affidavits that were submitted, how were those items corroborated other than by her own testimony? Sure, Your Honor. Respectfully, these details actually are in the affidavits. For example, Ms. Arita-Deras' husband and her sister-in-law's statements discuss the language of the death threats Ricardo sent to her. And that's on pages 308, 312, and 330 of the administrative record. And so all of these statements discuss what Ricardo used to threaten petitioner, in which she specifically says he is targeting her. If I could interrupt you for a second. One of the things that I think concern the immigration judge and what I'm asking about is there's never a discussion by anybody of this fellow Ricardo or the rationale or any of the other people that she mentions. And the immigration judge asked for corroboration in that regard. But I'm not finding that in any of these affidavits that were submitted. Can you show me specifically where that appears? Your Honor, so the affidavits and statements from the family members do not mention Ricardo by name. They instead refer to him as her husband's enemies or the gangs generally. And there's actually no requirement that an asylum applicant has to give the exact name of his or her persecutor in order to qualify for asylum. But I also want to note that almost two years before petitioner had her merits hearing before the immigration judge, she had her credible fear interview. And that's when she actually mentioned Ricardo by name several times. For example, on page 450 of the record, she identifies Ricardo as her husband's enemy. And this corresponds to the use of the term enemy in petitioner, her husband's and their family's affidavits and letters. I don't think there's any doubt that she uses all those terms. But I don't find anything in Mr. Vidal's affidavit that corroborates that. I mean, the enemy could be anybody. Well, Your Honor, her husband's affidavit does not name Ricardo, but it refers to him as a gang member and discusses in great detail his reasons for targeting petitioner. Which is all we need to know for nexus, that the persecutor was targeting Ms. Rita Deris based on membership in her family's, in her husband's family. I also want to point out additional pieces of key evidence. We have the independent documentation of the three family members' murders, the barrel permits, the death certificate, and the certificate of corpse removal. So on page 349, we have the certificate of corpse removal actually for the father-in-law, specifically states that he was murdered and that his body was found discarded on the side of the road, riddled with bullet holes. Which is directly in line with Ms. Rita Deris' testimony on the circumstances of her father-in-law's death. And I also want to circle back to the affidavits and letters Ms. Rita Deris submitted from her and her family members. She submitted affidavits from her, her husband, and her brother-in-law elder, in addition to letters from her mother-in-law and sister-in-law. And again, these documents discuss in detail the murders and threats that Ms. Rita Deris and her family suffered. But they also further go into why Ricardo was going after petitioner, that is, he was going after her based on her membership in her husband's family. For example, we have her, her husband's, and her sister-in-law's statement, which discuss the language of the death threats. And this is on its own sufficient to show Nexus' corporate claim because the death threats qualify as past persecution. And they are clearly targeted towards her based on her relationship to her husband, given that they specifically reference her husband's name and admit that they are targeting her based on her husband. I also want to direct this court to page 356 of the record, which is her brother-in-law elder's affidavit. And her brother-in-law actually received asylum on the exact same basis that she is now seeking asylum, that is, based on his membership in his brother's family. And so elder says, our family is in great danger from my brother's enemies, especially his wife and their children, because our enemies know that hurting them would really hurt my brother. These are just some of the many instances in which these documents address Nexus and the key events underlying Petitioner's claim. In finding that Petitioner did not sufficiently corroborate her claim, the immigration judge applied erroneously heightened standards to require independent objective evidence of Nexus, the in-person testimony of Petitioner's husband, a witness whom Petitioner could not compel to testify in person, and requirements for affidavits that are not based in law. First, the immigration judge's clearest error is requiring that Petitioner submit independent objective evidence of Nexus without specifying exactly what evidence he was seeking or making a finding on whether such evidence was reasonably available. And this is in direct violation of this court's recent decision in Wambora and also its earlier decision in Linjam. The immigration judge's requirement that her husband testify in person is also reversible error. I want to be clear and say that we don't need her husband's testimony to corroborate for Nexus, given that the death threats Ms. Rita Deris received on the basis of her relationship to her husband are on their own enough to entitle her to asylum because we have past persecution that is clearly on the basis of her relationship to her husband. And in requiring the husband's in-person testimony, the immigration judge was actually seeking corroboration for an issue that is not relevant for Nexus. The immigration judge makes several statements indicating that he's confused about who has to show Nexus for Ms. Rita Deris's asylum claim. For example, on page 177, the immigration judge says, Well, counsel, in this case, the immigration judge said, you know, what's the reason that your husband isn't here? And the answer given was, well, he's he's in the country illegally, which would be true in almost every case where they're looking for a witness. But it seemed odd in this case where they live in the same city where the proceeding is taking place. The immigration folks obviously know where they live because they send notices to their home. And Ms. Vidal has given them her address and told them where they live. Why is that an unreasonable request? Well, Your Honor, it's unreasonable because she asked to testify and he refused. So his absence was out of her control. And instead of his in-person testimony, he submitted an affidavit from him. And again, I want to emphasize that. We have some prior cases that discount the importance of affidavits as corroborating evidence. Our Singh case, our Gonziami-McHale case. How do you reconcile the language in those cases with what you're asking us to do today with regard to the weight of the evidence? Sure, Your Honor. So this court has never held in a family-based claim that affidavits and letters from family cannot constitute corroboration, which makes sense because in these types of asylum cases, the statements of family members are often the only evidence someone can submit to support their claim. And I also want to direct this court to the Mbalaboba v. Sessions case, which is actually the most recent case from this court on this issue. It's from 2018. And this court recognizes that family statements can constitute corroboration. I see I'm out of time, Your Honors, but I do have a few additional points I'd like to address. All right, Counselor, I'll give you a few minutes. Go ahead. Great. Thank you, Your Honor. In going back to the husband's absence, the record is clear that the immigration judge was clearly confused as to who had to show nexus and who had to show entitlement to asylum. On page 225, he says, Your husband is the one who has the principal asylum claim here, and he can't connect the dots. He's referencing the husband's absence. In Gentile Lynn v. Holder, this court actually addressed a situation in which a potential witness did not appear in person to testify for an asylum applicant's claim because they were undocumented. This court actually expressed significant doubts regarding that immigration judge's ruling that petitioner's wife, who had a final removal order, was required to testify in person and that she was an available witness. And I also want to note that here, Ms. Rita Deris has an even stronger reason not to have her husband testify in person because she submitted an affidavit from him, and the record is clear that she asked him to testify, but he refused. The immigration judge also labels her husband a self-interested witness on page 34 of the record. So we're not even sure if her husband came in to testify, if the immigration judge would have accepted the husband's testimony. In this case, Your Honor, the immigration judge was essentially imposing moving targets for corroboration. Mr. Rita Deris testified credibly and in great detail regarding all the important facts for her claim. He then required corroboration, but when she submitted statements from her family members, he said that wasn't good enough because she needed to submit unspecified, independent, objective evidence of nexus. When she submitted an affidavit from her husband, he said that wasn't good enough because the husband had to come testify in person. But he also indicates that because the husband is biased, he might not potentially accept his testimony. Your Honor, I just have a few additional points on the immigration judge's rulings on these affidavits as lacking. Counselor, your time is up, so I'll give you one more minute, but you will be heard from your side. Sure, Your Honor. I will wrap things up quickly. The immigration judge says that these affidavits are lacking details, but these affidavits actually contain many of the details the immigration judge contends are lacking, such as the time and location of events and Ricardo's motivation for targeting Ms. Rita Deris and her family. And for these reasons, Your Honor, this court should reverse the agency's erroneous corroboration ruling. If this court has no more questions, I will turn it over to my co-counsel, Ms. Berman. Thank you, Counsel. Ms. Berman? Good morning, Your Honor. It's Amanda Berman from Kroll & Moring. I'm going to be focusing on the nexus issue here. The Board of Immigration Appeals did not apply the correct legal standard when assessing whether there was a sufficient nexus between Petitioner's membership in the particular social group of her husband's family and the persecution she endured. Basically, neither the board nor the immigration judge asked the right question, which was whether record evidence shows that Petitioner's family relationship to her husband was at least one central reason why she was targeted. And, Your Honor, that's the same mistake that the board made in the Hernandez-Cartagena case, in which this court recently overturned the board's decision and directed a grant of asylum, because the violence against the petitioner there, like here, was caused at least in part by her familial relationship. Just as the court found there, once the right question is asked, and that is why was Petitioner being targeted, the conclusion is quite clear. Whatever the gang's motives for targeting her family, Petitioner was targeted because of her membership in that family. And that is the same thing that is true here. And, Your Honors, I would point this court to the immigration judge's own summary of the key testimony on nexus. And you can find this in the record at page 63. And the immigration judge at page 66 finds this testimony credible. His own summary states that Ricardo's gang repeatedly threatened to kidnap and kill Miserita Derris and her son in order to try to get her husband to come back so they could kill him. And the immigration judge also found credible Petitioner's testimony that other members of the very same particular social group, the same family, were killed by the gang in order to hurt Petitioner's husband. Your Honors, it's hard to think of facts that more clearly show persecution based on membership in a family. In fact, as in the Diaz-Velasquez case this court decided in 29, the familial relationship is the only fact in this record that can explain why the gang targeted Petitioner and not someone else. And that's more than Petitioner had to show. She only had to show that membership in her husband's family was at least one central reason why she was targeted. Instead, the immigration judge characterized the violence she faced as general criminal violence by private actors. But in doing so, it essentially ignored the at least one central reason standard. Stating that a person is the target of general criminal violence by private actors does not mean, as a matter of logic, that they were not also targeted because of a familial relationship. To put it another way, the board's conclusion that the persecution was the result of general criminal violence doesn't answer the question of whether Ms. Rita Derris was targeted for such criminal violence because of her membership in her husband's family. And, Your Honors, any violence by non-state actors could be targeted as general criminal violence by private actors. The board also erred here by ignoring that the immigration judge was plainly not applying the particular social group analysis and nexus requirements properly. He characterized Petitioner's claims as subsidiary to her husband, saying it's your husband who has the primary asylum claim here. And that's simply wrong as a matter of immigration law. The INA gives Petitioner a direct claim as a member of a particular social group. The judge also told Ms. Rita Derris that what he cared about was not, you know, why is the gang targeting you, but why are they targeting your husband? And you can see this at pages 177 to 78 of the record. Again, that's simply not the right legal question on nexus. As stated most recently in Hernandez-Cartagena, the right question is whether Petitioner's familial relationship is at least one central reason why she was persecuted. Not the sole reason, not whether can the violence also be characterized in some other way, like as general criminal violence, and not why was the family targeted. And, Your Honors, this is not the first time that the board has made this mistake. In the Hernandez-Cartagena case, while I think it is beautifully on point, was no change in the law in this regard. Rather, this court has had to correct the board again and again on this issue. It did so in the Diaz-Velasquez case in 2019, in Salgado-Sosa in 2018, Hernandez-Avalos in 2015, Cruz 2017, Cordova 2014. And in several of those cases, this court called out the board's, and I'm quoting here, excessively narrow view of the nexus requirement as a consistent error. The board made the same error here. And finally, Your Honors, the board also improperly suggested that Petitioner's particular social group is not a valid one based on the Attorney General's recent decision in matter of LEA. And that belief appears to have improperly influenced the nexus decision because it immediately precedes it. And the nexus decision is then very short and cursory. Now, the government has conceded in its brief that it cannot defend the board's decision below based on matter of LEA. And it says that the board accepted the particular social group. And yet in footnote 15 of the government's brief, it asked this court to remand the matter to the board if this court agrees with us on the nexus conclusion, so that the board can then decide whether this family is a particular social group. Your Honors, this court should not do that here. We explained in our brief why the dicta from matter of LEA that suggests that average families will not qualify as particular social groups is wrong as a matter of law. That is including because this court has repeatedly held otherwise in a line of cases that includes most notably the Crespin-Valladares decision. And this court said that again most recently in Hernandez-Cartagena. And that was after the Attorney General's decision in LEA. And even if that dicta in LEA were sound, it cannot be applied retroactively to asylum claims that predate us. We went through the retail wholesale analysis on that point in our brief. Therefore, Your Honors, I would ask that as this court did in the Hernandez-Cartagena case, this court can and should reverse on the nexus point and reverse the board's decision and hold that petitioner was persecuted on account of her membership in a particular social group consisting of her husband's family. Thank you, Your Honors. Thank you, Counsel. Mr. Mercado. Thank you, Your Honor. And may it please the court, Trema Mercado from the Department of Justice on behalf of Respondent. I don't want to spend too much time on it, but I did just want to mention very briefly that if the court wishes to invoke it, the Fugitive Disentitlement Doctrine would apply here. It's obviously an equitable doctrine, not jurisdictional, and I prefer to spend more time on the merits.  Petitioner seems to suggest that because the IJ found her credible, that we must accept everything she said is true, including this linchpin fact that Mercado was kind of the mastermind persecutor behind everything. But that's not true in a case where the immigration judge properly asked for corroborating evidence. Under the Real ID Act 1158B1B2 and this court's decision, then Linn Jan, which is 49F3R191, even for credible testimony, the IJ can ask for corroboration. And, of course, what that means is that if the IJ asks for corroboration properly but doesn't get it, then it's the same ultimate outcome as if the petitioner hadn't been credible in the first place. Essentially, the petitioner hasn't demonstrated her case. And here the IJ did properly ask for corroboration. As this court held in Singh 699F3R331, the immigration judge was not fully satisfied with her story. What kind of corroborating evidence are you saying would have been necessary in this case? So I don't think there's any particular piece, Your Honor, that's a linchpin, absolutely necessary type of document or testimony. You know, you need to give us a little bit of kind of flesh on the bones here so we can understand what you're saying. I mean, we've got a lady here who testified very specifically. We have our Bedoya case very recently talking about death threats being evidence of past persecution. She had her family members' burial permits here. It wasn't just the affidavits, the burial permits of the family members who were murdered. So what was necessary? Are you maintaining that her husband had to have come in in order for her to prevail? A few responses, Your Honor. I agree that she did document the deaths of the family members. That's not really the issue. That's not where the lack of corroboration comes from. The lack of corroboration is about Ricardo's involvement. That's her theory, that Ricardo was the persecutor. And on that, she could have introduced more detailed declarations. Out of all the declarations she introduced, only one mentioned Ricardo, and even then it was only once. Her husband could have testified. The IJ didn't say that the husband absolutely had to testify, but the petitioner kept saying that she had no personal knowledge about whether Ricardo was the one behind all this. She said it was all what her husband was telling her. And her husband did submit a declaration, but, again, it doesn't mention Ricardo even once. So the husband could have testified and provided some backup there to help corroborate her story. The petitioner mentioned that a nephew had confirmed that one of the threats she claimed she got on her phone was, in fact, from Ricardo, that he recognized the phone number. So a declaration from that nephew that would tie the threat specifically to Ricardo and confirm her story as to how this is all happening. Mr. Mercado, may I ask you a hypothetical? Of course. What if it wasn't Ricardo at all, but instead it was someone else who the husband didn't want to name, but nonetheless that unnamed person was angry with him and targeted his family? Would it make any difference that she didn't know who Ricardo was? As a matter of fact, Ricardo had nothing to do with it, but instead it's an unnamed person that her husband didn't tell her, but he was targeting the family and threatening, as the records demonstrate here. Go ahead. I think kind of as a theoretical matter, Your Honor, it wouldn't matter if they could identify that it was, in fact, someone who's behind it all. I'm not saying she had to identify a specific person, but the point is it's kind of twofold. She does identify Ricardo. That's her story the whole time, and she can't corroborate that particular aspect. But also, if she can't confirm that it's at least the same persecutor who's actually doing all this, then there's a lack of corroboration for that, Your Honor. Otherwise, it's no different than being the victim to several seemingly unrelated crimes that everyone kind of assumes is chalked up to the same person, whether it's Ricardo or someone else. So it's kind of twofold, Your Honor. In this case, I think that she's pinned her argument on Ricardo, and also even if it weren't Ricardo, she hasn't identified that it's a specific persecutor who's coming after her. Because of that, that's why she has no corroboration on that specific point. Well, does it need to be a specific persecutor, or does it need to show that persecutor or persecutors were targeting her family and her as a member of that family? It seems to me maybe you're placing a little bit too much reliance on it being an identifiable persecutor. As long as she is the target and her family is the target, and we've got the dead relatives, people being murdered, why isn't that very strong circumstantial case? It seems to me that you're asking for direct evidence when that may not be required. I agree it doesn't have to be a specific person necessarily, Your Honor, but, of course, the intent of the persecutor is the key issue here. And if we don't know who these persecutors are or whether it's one person or whether it just happens to be random gang violence or other violence that's unaffiliated, then we can't say that she's actually being targeted because of her protected status, Your Honor. So I think that's why it was so important, especially given the way Fishner framed her case, for her to come forth with evidence after the IJ asked for it, that she actually is the target of some scheme here, and especially given that she focused so much on Ricardo, that Ricardo was the one behind it, Your Honor. And she was in a vehicle, too, wasn't she? I mean, that's pretty compelling. She claimed that, Your Honor. Again, that was something that wasn't corroborated. Her husband, remember, had listed the same story kind of copy and pasted in his declaration. Didn't say Ricardo was behind it or anyone else in particular. All of her threats were framed in the reference to her husband was the basis, was the core, wasn't it? We're doing this because we want threatened, kidnapped, and harmed to her because we want to try to get your husband back into the country. It was no question that everything was framed. It was never framed like somebody's after me. I don't know why. The why was always connected with her husband and her familiar relationship with him. I agree. She certainly testified to that, Your Honor, and those were her allegations. But then again, she didn't have corroboration to back it up. Again, her husband needed to come in and say, yes, this man is after me. It didn't have to be her husband. I think he would have been an excellent source, and that's what the IJ says, Your Honor, that the husband was the source of all the information or almost all the information the petitioner testified to. So the husband would have been an excellent source. I mean, just as an aside, I think perhaps the husband could have come in by video or some other way. We don't know for sure. But it's not necessary that the husband testify and that that is the whole reason the petitioner lost. There were other bases the IJ listed as the ways that she could corroborate her claim. As I said, declarations that actually talk about more specifically who the people are to show that there actually is a scheme to attack her husband's family, as opposed to this being kind of unaffiliated, unrelated violence. And remember, Your Honor, Tonduras does have the highest murder rate in the world, and so it might not be that unusual that over the course of several years, a single family might have several family members who are, unfortunately, the target of violent crime. And so I think given that the IJ had asked for corroboration, and given that the petitioner wasn't able to come back with anything, even though there were several specific findings by the immigration judge at pages 7 and 8 of his decision, that that evidence would have been reasonably available with the Real ID Act standard, that that resolved almost all of the petitioner's case. What are we to make of the fact, the comments that, well, perhaps if the husband came in, he would be a self-serving witness? Wouldn't that suggest that it's a catch-22 for her? I think the immigration judge was just citing this court's decision in Singh, Your Honor, 699F3331, I think it is, that says that declarations or statements from family members, they're not always entitled to full weight. I don't think the immigration judge would have just completely discounted a husband's statement. It would depend on the detail and everything. That may be your thinking, but what he said was he would be self-serving. That's pretty much a finding of fact, isn't it? I think it's more of kind of a, perhaps a prediction, Your Honor, of what the husband might say. How would that be a prediction? It's not a prediction. He said it would be self-serving. I think he's just relying on this court's decision in Singh, Your Honor, which does say that it's troubling to rely on declarations from family members. It's not that they're not entitled to no weight, or that we just shouldn't count them at all, and therefore the IJ is asking for something, but then saying, ah, but if you don't give it to me, or if you do bring it to me, then I'm not going to count it. I think what he's saying is the husband could be a very excellent source of corroboration, but I will note, as the Fourth Circuit has held in Singh, that family member declarations, kind of statements, are often taken with a grain of salt, and that's what this court held in Singh. So I think that's what he was relying on, Your Honor. And kind of back to the point of corroboration and a little bit on the point of nexus, there were several places where Dishner herself had talked about that she was kind of speculating as to who was behind all this. She had said at 253 that she doesn't know exactly whether Ricardo was behind everything. At 226, she says that she's not basing it on anything, that her father-in-law's death was caused by Ricardo or his gang. She does the same for the drive-by shooting at 214. She says she doesn't know who's behind that. For the deaths of the husband's brother and brother-in-law, again, she says at 206, I don't know exactly who was behind it. For the three armed men, she said, that she saw outside of her house at 232. She said, I don't know who they were. She was doing exactly what Jess Keenan talked about. You're mounting up some circumstantial evidence. You're naming all these close relatives who were murdered and say, well, you know, she didn't know who it was. That's all corroborating, really, exactly. It shows her honesty. I don't know these people by name, but I know they're attacking my family. And we're dying. It is her testimony, Your Honor. That's all she has is her testimony, her desperation and her testimony. What other stock in trade does she have in a case like this? She could have, as I had mentioned earlier, Your Honor, declarations from the nephew who apparently had tied these alleged threats to Ricardo himself. She could have copies of the threats, copies of police reports that mention these crimes and perhaps attach it to Ricardo or his gang. Again, she could have had the husband come in, Your Honor, that sort of thing. Those are the things she could have had to bolster when the IJ says that he generally believes the petitioner, but he wants more evidence to back it up. I think what the IJ is saying is that the petitioner herself genuinely seems to believe that Ricardo and his gang is behind all of this, but there are some logical gaps here that don't quite explain why Ricardo would actually be the one or his gang would actually be the one behind it all. That's why he wanted corroborating evidence, Your Honor, which the REAL ID Act allows him to do. Then, as we've discussed at length, the petitioner wasn't able to come in with anything more specific. On the question of the gaps in her own testimony, she had mentioned, of course, that she had never been injured by Ricardo or his gang. She said during her asylum interview at 453, quote, they never threatened me. At 234, in front of the immigration judge, she said, perhaps they, referring to Ricardo and his group, perhaps they didn't even have the intention of harming us. It seems like the IJ largely just agreed with that. Given the substantial evidence review standard, Your Honor, I think that is probably enough to resolve that issue. Of course, the IJ also pointed to the fact that Ricardo allegedly had a year and a half where a petitioner and her son were kind of exposed by themselves and didn't try to attack, two years where Ricardo could have attacked her husband any day and didn't try. So there's the corroboration issue that we've discussed, and then the facts that I just mentioned go, I think, more to the nexus issue of whether there's actually a tie to the family here. Of course, the husband's mother, brother, and sister all still live in Honduras the last 10 years, apparently without any issues. So when you kind of put it all together, Your Honor, we've got no documentation about Ricardo's involvement, even after the IJ asked for it. The petitioner herself says she isn't sure, and that's just not the kind of compelling evidence that would be required under the very heavy standard of review in this case, Your Honor. And I don't mean to diminish the crime and the violence that her husband's family has been subjected to. I just think the immigration judge and BIA had enough evidence to support their conclusion that there wasn't corroboration for Ricardo, for the scheme, for the gang of this all being persecution. And that resolves Petitioner's asylum claim, Your Honor. There were a couple points, if I could, that I did want to address briefly, based on arguments that my friends made on the other side. On the one central reason test, Your Honors, the BIA did quote the proper test at AR page 5. So the BIA was fully aware of the NEXA standard here, Your Honor. I know the petitioner disagreed about whether it was applied correctly, but the BIA certainly was aware of that standard. On the IJ's few stray remarks he had, for example, the statement that the husband has the principal asylum claim, that tracks almost verbatim what Petitioner's own reply brief says. At page 12, footnote 3, they say that Petitioner's asylum claim is predicated on her husband. So I think the IJ probably just meant what Petitioner's themselves meant in that footnote, which is that Petitioner's claim kind of rests factually on her husband and whether his family is being targeted. And the IJ was just pointing out, well, even the husband doesn't seem sure that this is what's going on. It's kind of just trying to keep the testimony on point, focused on that issue. And it was the same with another point that my friends had mentioned that the IJ said he was interested in why Ricardo and his men were targeting the husband. Again, that's just the immigration judge in the context of the transcript, just the immigration judge trying to keep Petitioner focused on that particular aspect of her case before moving on to why Ricardo might be attacking Petitioner herself. And one final point. My friends mentioned the Lombura decision from this court that recently came out about whether the corroborating evidence would be reasonably available. The BIA did say that the evidence that the IJ had asked for would be reasonably available. That's AR page 4. The immigration judge twice said at pages 7 and 8 of his opinion that he thought the evidence he was asking for would be reasonably available. So he did make those findings, Your Honors. And just as an aside, the Petitioner didn't raise this argument before the BIA, and, of course, that's a jurisdictional defect out of this court's decision in Cabrera. But not that the court would need to reach that. But I just wanted to address that briefly. And I think on the matter of LEA, Your Honors, I filed the 28J on that issue. I think the BIA didn't rely on that. There's no evidence they did, and so this court doesn't need to reach that issue. And unless the court has any further questions, I would just rest on my briefs, Your Honor. Thank you, Ms. McConaughey. Ms. Berman? Yes, thank you, Your Honors. I want to follow up on a couple of points that my colleague for the government addressed. First, it doesn't matter who was the mastermind persecutor, as you said. That simply doesn't matter. What is clear from the affidavits, as well as Ms. Arita Deris' own testimony, is that a gang, one set of enemies, was persecuting the family in order to get at the husband. You cannot read the affidavits and come away with the conclusion that it could possibly have been all random acts of disparate violence. That is completely inconsistent with the affidavits, with her own testimony. Ultimately, it doesn't matter if the gang was led by a guy named Ricardo or not. It was a gang that was targeting her because of her relationship to her husband. And she did have the personal knowledge of why she was being targeted, which is the key point here in regard to both corroboration and the nexus issue itself. You know, my colleague for the government pulled out this list of statements where she admits she doesn't know things. She admits, I don't know, you know, I don't have direct personal knowledge of who murdered my husband's father and brothers. You know, they didn't leave notes by the bodies. But what she does know is that she got two notes at her house. Meanwhile, while she was in hiding at a relative's house and not staying there in order to avoid meeting the same fate, she gets two notes at her own house that she testified say, we're coming after you and your son in order to get Pineda Vidal to come back to the country so that they can kill him. And again, the immigration judge's own summary of her testimony, which he found credible, is that Ricardo directly sent Ms. Arita Deris' text messages as well, saying that he was going to kill her and her son to get the husband back. That is really all that is needed to substantiate her claim, which is based on her connection to her husband's family. Your Honor, I'd like I'd also like to point out that contrary to what my colleague from the government just said, the immigration judge did not make the finding that's required under Whambora, that there was some particular piece of corroborating evidence on the nexus issue that was reasonably available and that petitioner didn't provide. He didn't identify something like, for example, you should have given me the notes. He didn't say that. He asked her, why don't you have them? She explained that she had not kept them. He didn't question that or say that's what I need. It was a very general statement. The separate conclusion that the husband should have corroborated his own written testimony by appearing in person to testify doesn't fill that gap. The husband could not have testified about those notes, those threats that she personally received as to what they said and why the gang was targeting her. He wasn't there. He was already in the United States at that point. In short, Your Honor, the judge was seeking corroboration on the wrong issue here. He wanted to know why petitioner's husband was targeted. He wanted petitioner's husband to come in and explain that. That issue is legally irrelevant. Again, it all goes back to the judge was not asking the right question. And finally, I want to briefly address the Fugitive Disentitlement Doctrine since my colleague brought it up. Your Honors, an argument that is made in passing is not an argument under this Court's precedent. An argument that is not made in the argument section of a brief is also not an argument. An argument in a footnote outside the argument section of a brief is even less of an argument. This Court has never applied the Fugitive Disentitlement Doctrine. It certainly should not do so for the first time where it is not properly raised, where we have not fleshed out the facts, that the government hasn't even identified the facts that it thinks make this doctrine applicable or explain the legal standard that it thinks applies under the precedent out there on this, which varies from circuit to circuit. So, Your Honors, you know, even the government says this is in any event just an equitable doctrine. This is not a case where the Court is compelled to apply it. And it would certainly be inequitable to do so here under the circumstances where it hasn't been properly raised. So if there aren't any other questions, I will rest on our briefs at this point. Thank you very much, Counsel. We can't come down and greet you as we would in our normal tradition of the Fourth Circuit. But please know that the sentiment is just as strong. And very much, we appreciate your arguments and helping us on these cases. Be safe and stay well. Thank you, Counsel. Thank you, Your Honor. Thank you, Your Honors.
judges: Roger L. Gregory, G. Steven Agee, Barbara Milano Keenan